IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WILLIAM L. FRAIM, et al.,               )
                                        )
                Plaintiffs,             )
                                        )
        v.                              )        Case No. 1:20CV1011
                                        )
CHILLY DIL CONSULTING, INC., et         )
al.,                                    )
                                        )
                Defendants,             )
                                        )

<u>MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE</u>

This matter is before the Court on a Motion for Summary Judgment [Doc. #28] filed by

Defendants David Carlin, Patricia Carlin, and Chilly Dil Consulting, Inc. (Chilly Dil)

(collectively "Defendants").  This case involves claims by Plaintiffs William Fraim, Bonita

Fraim, and the William Fraim Trust (the Trust) alleging negligent misrepresentation, fraud,

mutual mistake, and unfair and deceptive trade practices related to the purchase of a home.

As part of the sale, Defendants made real property disclosures answering "No" with respect

to, *inter alia*, whether there was any water seepage or leakage in the basement or slab.  Soon

after closing, Plaintiffs discovered water intrusion and seepage, and subsequently discovered

that there had been a history of such issues of which Defendants were aware.  Defendants

have moved for summary judgment, contending that there are no genuine issues of material

fact and that they are entitled to judgment as a matter of law because the disclosures were

not false, that Plaintiffs' reliance on the disclosures was not reasonable, that Bonita Fraim

and William Fraim are not the real parties in interest, that the Trust did not receive or rely on the disclosures, and that there can be no claim for unfair and deceptive trade practices related to a sale of a residential dwelling. For the reasons set forth below, this Court recommends that Defendants' Motion for Summary Judgment be denied.

I.  FACTS, CLAIMS, AND PROCEDURAL HISTORY

Plaintiffs William Fraim and Bonita Fraim are citizens and residents of Ohio, and the William Fraim Trust is a revocable trust with William Fraim as Settlor and as Trustee. (Compl. [Doc. #1] ¶ 4; Jt. Ex. 44[1] [Doc. #30-7 at 370–86].) Defendants David Carlin and Patricia Carlin are citizens of Utah (Compl. ¶¶ 6-7.) Patricia Carlin is the president, sole director, and owner of Chilly Dil, a Florida for profit corporation organized and existing under the laws of the State of Florida. (Compl. ¶¶ 5, 7; P. Carlin Dep. [Doc. #30-1 at 12].)

On May 13, 2015, Chilly Dil, acting through David and Patricia Carlin, purchased a historic home on Barrett Road in Pinehurst, North Carolina ("the Property"). (P. Carlin Dep. [Doc. #30-1 at 19]; Jt. Ex. 61 [Doc. #30-8 at 83–84].) The Carlins also purchased a separate house to live in while they undertook renovations on the Property since the Property was "decrepit" and "abandoned" at the time of purchase. (P. Carlin Dep. [Doc. #30-1 at 18-19].) At that time, a home inspection report was made for Patricia Carlin for the Property reflecting "evidence of previous moisture intrusion in the basement." (See Jt. Ex. 99 [Doc. #30-8 at 485–515, 496].) Renovations were undertaken by Wayne Haddock of Pinehurst Homes, Inc. from 2015 to 2017. These renovations included converting the unfinished basement into a finished basement with a gym/workout room, sauna room,

_____

[1] The joint collection of Exhibits from the Depositions, located at Doc. #30-7 and #30-8, will be referred to as "Jt. Ex."

2

theater room with leather chairs, kitchenette, and a game room/living room with a fireplace. Records from the renovation reflect ongoing efforts by Pinehurst Homes to address water in the basement. For example, on October 3, 2015, Patricia Carlin emailed Wayne Haddock of Pinehurst Homes regarding pictures of water intrusion in the basement explaining "[t]here was a little water in the main part of the basement after that week of storms. This is full flooding." (Jt. Ex. 68 [Doc. #30-8 at 154].) In addition, on October 4, 2016, Wayne Haddock of Pinehurst Homes emailed Dave Carlin and expressly stated that water proofing areas of the basement in the manner they discussed "should help the water intrusion but you know will not stop it." (Jt. Ex. 74 [Doc. #30-8 at 171].) Similarly, on November 3, 2016, Wayne Haddock again expressed his concern regarding water entering the basement, noting:

> After experiencing this last rainfall with the basement flooding, I think we need to discuss the VCT on the concrete basement floor. I am concerned it will not bond due to the amount of water that could come through the slab if the water aquafer is high from rainfall. I feel like we should consider some type of sealer on the floor like you see in garages? The cracks in the old concrete allows water to leach up from the subgrade. We cannot stop the basement from flooding during a large rainfall. As you know there are 6 sump pumps in the basement. HOWEVER – we are sealing the exterior walls that will hopefully slow the water penetration.

(Jt. Ex. 77 [Doc. #30-8 at 183].) The renovations included the sealant on the interior of the foundation walls and installation of a sump-pump system and dehumidifiers, as well as the construction of interior walls offset from the basement foundation walls, creating a cavity between the foundation walls and the finished basement walls. A Certificate of Occupancy was issued on March 30, 2017. (Jt. Ex. 52 [Doc. #30-8 at 17].) Even after that date, on June 20, 2017, Haddock discovered water standing on the basement floor and a sewer lift pump was not working properly. (Jt. Ex. 81 [Doc. #30-8 at 215.) David Carlin admitted that

3

Wayne Haddock told them that in his opinion, they could not stop the basement from flooding during a large rain fall. (D. Carlin Dep. [Doc. #30-2 at 38-40, 62]; see also P. Carlin Dep. [Doc. #30-1 at 50, 57–58, 121].)

The Carlins moved into the Property sometime in the spring of 2017, and a few months later, on January 24, 2018, Chilly Dil listed the Property for sale through real estate agent Jennifer Nguyen. (Jt. Ex. 92 [Doc. #30-8 at 345].) Chilly Dil also listed the Property on VRBO, a rental online marketplace whereby homeowners can rent their properties as vacation rentals. (P. Carlin Dep. [Doc. #30-1 at 86].)

Nine months later, in September 2018, while the Property was still on the market and while the Carlins were living there, Hurricane Florence made landfall in North Carolina and impacted Pinehurst. The rainfall from Hurricane Florence resulted in flooding in portions of the Property's basement when the house lost power and the sump pumps were not operational. (P. Carlin Dep. [Doc. #30-1 at 88-89].) As a result of the water intrusion, Chilly Dil filed an insurance claim and ultimately undertook approximately $40,000 in repairs on the basement, again using Wayne Haddock of Pinehurst Homes. (P. Carlin Dep. [Doc. #30-1 at 89-94].) Patricia and David Carlin moved out of the Property to Utah in November 2018, and repairs to the basement concluded in July 2019, including additional sump pumps, new walls, sealant on foundation walls, new drywall, baseboards, trim, and painting. (See Jt. Ex. 86 [Doc. #30-8 at 289-99].) However, according to David Carlin, Haddock told them that in his opinion, they couldn't stop some water intrusion. (D. Carlin Dep. [Doc. #30-2 at 49-50].) In February 2019, as part of those repairs, Haddock specifically required Chilly Dil to execute a hold harmless agreement, providing that Chilly

4

Dil would not "hold Pinehurst Homes, Inc. or its representatives responsible for any mold, mildew or any other problems that may occur from water intrusion at the residence." (Jt. Ex. 88, Doc. #30-8 at 316.)

After the repairs were complete, in August 2019, Chilly Dil again listed the home for sale, this time with Audrey Wiggins. (Wiggins Dep. [Doc. #30-5 at 13-14].) That listing noted that the Property "offers a unique opportunity as an Income producing property for corporate retreats, family retreats, and would make a profitable rental for the 2024 US Open golf tournament" and further that "[t]he current owners have had much success renting the estate to corporate groups & tourists at approximately $1400 per night." (Jt. Ex. 49 [Doc. #30-7 at 420]; Jt. Ex. 90 [Doc. #30-8 at 331].)

In October of 2019, Plaintiffs William and Bonita Fraim began to search for a home in the Pinehurst area and located the listing for the Property. On November 2, 2019, Bonita Fraim visited and toured the Property with her real estate agent, Kristi Snyder. Bonita Fraim made an offer to purchase the Property the following day after viewing it for a second time. (Jt. Ex. 1 [Doc. #30-7 at 1-14].) Chilly Dil and Bonita Fraim entered into a real estate contract comprised of the standard "Offer to Purchase and Contract" Standard Form 2-T, and an addendum on Standard Form 2A11-T. The purchase price was $2.075 million, and the parties agreed that the closing would take place on December 20, 2019, and that the deed would be made to Bonita and William Fraim. As part of that process, Bonita Fraim was given a Disclosure Statement regarding "the characteristics and condition of the property,"

5

signed by Patricia Carlin and listing Chilly Dil as the owner, dated October 2, 2019.[2] (Jt. Ex. 5 [Doc. #30-7 at 20-23].) Question Two of the Disclosure Statement asks "[i]s there any problem, malfunction or defect with the dwelling's foundation, slab, . . . interior and exterior walls, . . . or other structuring components including modifications to them?" The form is marked "No." Question Six of the Disclosure Statement asks "[i]s there any water seepage, leakage, dampness or standing water in the dwelling's basement, crawl space, or slab?" The form is marked "No." (Jt. Ex. 5 [ECF #30-7 at 20-23].)

The Parties entered into a due diligence period that extended from November 5, 2019 through November 27, 2019. During this period, the Fraims obtained eight inspections in addition to an inspection report that their real estate agent, Kristi Snyder, obtained from the Carlins' agent that was performed by Jere McKeithen two weeks prior at the request of a different potential buyer that ultimately did not purchase the Property ("McKeithen Report"). (Jt. Ex. 7 [Doc. #30-7 at 26-94]; Snyder Dep. [Doc. #30-6 at 26-27].) The purpose of the eight additional inspections were to further look at potential issues that were highlighted by the McKeithen Report. Given the contents of the McKeithen Report, the Fraims requested that additional inspections be performed by: Neal Smith, a structural engineer (Jt. Ex. 9 [Doc. #30-7 at 96–105]); Elite Roofing (Jt. Ex. 10 [Doc. #30-7 at 106–09]); Interstate Painting (Jt. Ex. 11 [Doc. #30-7 at 110]); Sandhills Electrical (Jt. Ex.

---

[2] Patricia Carlin identified her signature and initials on the Disclosure Statement, and David Carlin noted that the other initials "[c]ould be mine, could be Patricia's, could be both" and that he "probably went over" the form with the realtor but could not remember. (P. Carlin Dep. [Doc. #30-1 at 117-22]; D. Carlin Dep. [Doc. #30-2 at 60-61].) Under North Carolina law, misrepresentations in the Disclosure Statement can be attributed to corporate officers who signed the documents, and Defendants do not contend otherwise or challenge the liability of Patricia or David Carlin individually as part of the present Motion for Summary Judgment. The Court also notes that the Disclosure Form appears to be the form originally signed when the Property was listed with Jennifer Nguyn, but the date has been changed to October 2, 2019, with no other change to reflect the repairs undertaken after Hurricane Florence.

12 [Doc. #30-7 at 111]); Robert Payne of Cedar Rock Environmental, a licensed geologist (Jt. Exs. 13 & 14 [Doc. #30-7 at 112–17]); TempControl, an HVAC contractor (Jt. Ex. 15 [Doc. #30-7 at 118–19]); Keven Salvi, of Salvi Masonry (Jt. Ex. 17 [Doc. #30-7 at 121–28]); and The Plumbing Knight (Snyder Dep. [Doc. #30-6] at 35–36). Based on the inspections, Bonita Fraim requested that Chilly Dil repair all items referenced in the subsequent inspection reports. (Jt. Ex. 8 [Doc. #30-7 at 95]). In lieu of performing the repairs, Chilly Dil proposed reducing the purchase price by $35,000.00, and moving the Closing up to December 12, 2019. (Jt. Ex. 6 [Doc. #30-7 at 24-25].) The Parties agreed to this and proceeded with the transaction.

Prior to closing on the Property, the Fraims decided to use funds from the Fraim Trust to purchase the Property and substituted the Trust as the purchaser in the property sale. (W. Fraim Dep. [Doc. #30-4 at 26-27].) The Fraims' closing attorney notified Defendants' closing attorney of the Fraims' desire to substitute the Trust as the purchaser and that the title should be conveyed to the Fraim Trust, rather than Bonita and William Fraim in their individual capacities. (Jt. Ex. 94 [Doc. #30-8] at 402-417.) An Amendment and Assignment was executed from Bonita Fraim to the Fraim Trust. (Jt. Ex. 95 [Doc. #30-8 at 418].) Defendants' closing attorney agreed and made the revision. (Jt. Ex. 94 [Doc. #30-8 at 411].) Defendants' real estate agent also notified the Carlins of the Fraims' intent, and Patricia Carlin agreed. (See Jt. Ex. 93 [Doc. #30-8 at 397].)[3] In addition, William Fraim, who was Trustee of the Trust, received and reviewed the residential disclosure statement prior to the closing, and was also involved in reviewing and obtaining the inspections. (W.

---

[3] In her deposition testimony, Patricia Carlin was asked if she signed the Assignment and Amendment on behalf of Chilly Dil and she said, "Probably. Sure, I had to." (P. Carlin Dep. [Doc. #30-1 at 109].)

7

Fraim Dep. [Doc. #30-4 at 28-32].) On December 12, 2019, the Parties closed on the Property and the deed was conveyed to the Fraim Trust.

In early February 2020, two months after closing on the Property, Bonita Fraim noticed water intrusion in the basement. (B. Fraim Dep. [Doc. #30-3 at 43-44].) The Fraims retained an engineer, George Barbour, who opined that "multiple layers of waterproofing on the basement foundation wall have failed and the resulting water intrusion is an on-going issue. The cavity walls only serve to obscure this problem and provide an enclosed space creating conditions conducive to accumulation of mold." (Jt. Ex. 39 [Doc. #30-7 at 245-46].) Plaintiffs ultimately filed the present suit, alleging that Defendants materially misrepresented the condition of the basement of the Property and its susceptibility to flooding or water intrusion during the sale. According to Plaintiffs, "[w]hen Chilly Dil sold the Barrett Road Home to the Plaintiffs, Chilly Dil and the Carlins concealed water intrusion problems and misrepresented material facts related to the water intrusion problems in the home." (Compl. ¶ 1.)

Plaintiffs allege five claims for relief: 1) fraud, rescission, and restitution against Chilly Dil; 2) fraud against the individual defendants; 3) unfair and deceptive trade practices against all defendants; 4) negligent misrepresentation against all defendants; and 5) mutual mistake of fact against all defendants.[4] In their Complaint, Plaintiffs seek equitable relief in the way of: (1) rescission of Plaintiffs' purchase from Chilly Dil of the Property and of the executed real estate purchase contract; and (2) restitution of certain amounts paid by Plaintiffs in

---

[4] The Fourth and Fifth claims are made in the alternative.

connection with the Property. (Compl. ¶ 2.) Plaintiffs also seek to recover compensatory damages, treble damages, consequential damages, and attorneys' fees. (Compl. ¶ 3.)

Defendants now move for summary judgment. In the present Motion for Summary Judgment, Defendants contend that their disclosures were not false, specifically that "Plaintiffs have presented no evidence that, at the time the Disclosure Statement was executed and through the closing date, Defendants had actual knowledge of water seepage or moisture in the basement." (Defs. Br. [Doc. #29] at 2.) Defendants further contend that even if Chilly Dil's representation was false, Plaintiffs' reliance on the representation was unreasonable and therefore the claims should be dismissed. (Defs. Br. at 2.) Defendants also argue that Plaintiffs Bonita Fraim and William Fraim are not proper parties in interest because the Property was purchased by the Trust, and that the Trust did not receive or rely on the disclosures. (Defs. Br. at 2.) Finally, Defendants argue that "Plaintiffs' claim for unfair and deceptive trade practices is subject to summary judgment because Chapter 75 does not apply to the sale of residential property." (Defs. Br. at 2.) The Court will first address Defendants' contentions that summary judgment is appropriate on the merits, and will then address Defendants' contentions regarding the parties in interest.

## II.  DISCUSSION

Summary judgment is appropriate when no genuine issue of material fact exists. Fed. R. Civ. P. 56(a). A genuine issue of fact exists if the evidence presented could lead a reasonable factfinder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it

9

in the light most favorable to the non-moving party. Id. The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48).

### A. Misrepresentation and Concealment

Plaintiffs bring claims for both negligent misrepresentation and fraudulent misrepresentation and concealment. As to the claim for negligent misrepresentation, under North Carolina law:

> The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care. However, a party cannot establish justified reliance on an alleged misrepresentation if the party fails to make reasonable inquiry regarding the alleged statement. The extent to which a party justifiably relied upon items of information is generally a question of fact for the jury in the absence of a showing that the facts are so clear as to permit only one conclusion.

Cummings v. Carroll, 379 N.C. 347, 366, 866 S.E.2d 675, 690 (2021) (internal citations and quotations omitted). Similarly, to state a claim for fraud under North Carolina law:

> fraud has no all-embracing definition; instead, as a general proposition, fraud may be said to embrace all acts, omissions, and concealments involving a breach of legal or equitable duty and resulting in damage to another, or the taking of undue or unconscientious advantage of another. The following essential elements of actionable fraud are well established: (1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party. On the other hand, any reliance on the allegedly false representations must be reasonable.

10

Cummings, 379 N.C. at 371, 866 S.E.2d at 693. Defendants contend that Plaintiffs cannot establish claims for either fraud or negligent misrepresentation because (1) there was no misrepresentation or concealment because there was no water intrusion in the basement from the date of the Disclosures in October 2019 until the closing in December 2019; and (2) even if there was a misrepresentation or concealment, Plaintiffs' reliance was not reasonable because Plaintiffs were on notice of potential water problems in the basement and failed to sufficiently investigate.

### 1. False Representation

The alleged representation at issue involves a response provided in the Disclosure Statement presented to Bonita Fraim when she began the process of purchasing the Property. Specifically, Question Two of the Disclosure Statement asks "[i]s there any problem, malfunction or defect with the dwelling's foundation, slab, . . . interior and exterior walls, . . . or other structuring components including modifications to them?" The form is marked "No." Question Six of the Disclosure Statement asks "[i]s there any water seepage, leakage, dampness or standing water in the dwelling's basement, crawl space, or slab?" The form is marked "No." (Jt. Ex. 5 [ECF #30-7 at 20-23].) Defendants argue that the Disclosure Statement "does not ask whether there has ever been any water seepage, leakage, dampness or water in the basement" and that the Disclosure Statement only relates to a seller's actual knowledge at the time that the Disclosure Statement is signed. (Defs. Br. at 6–7.) Defendants argue that the record does not show that they had actual knowledge of water

11

intrusion for the period from October 2, 2019, when the Disclosures were signed, to December 12, 2019, at closing.

In making this assertion, Defendants rely on the renovations and repairs by Wayne Haddock at Piedmont Homes, and contend that the basement was renovated and finished by Haddock, including sump pumps, water proofing treatments, and similar measures, and that they were entitled to rely on those repairs in truthfully answering "No" on the Disclosure Statement.[5] Thus, the primary issue is the repairs and the extent to which Defendants were entitled to rely on those repairs.

The Supreme Court of North Carolina recently considered similar contentions in Cummings v. Carroll, 379 N.C. 347, 866 S.E.2d 690 (2021). In Cummings, purchasers of a beach home brought an action against the sellers and real estate agents alleging, *inter alia*, fraud and negligent misrepresentation against the sellers with respect to statements contained in the disclosure statement. The Supreme Court of North Carolina concluded that summary judgment should have been denied on the fraud and negligent misrepresentation claims against the sellers because there were genuine issues of fact regarding the sellers' failure to disclose the existence of the history of water intrusion problems at the house. Specifically, evidence in the record reflected that over the course of nearly a year prior to closing, the defendants had been aware of water intrusion problems, which was at odds with the representation contained in the disclosure statement concerning the condition of the house. Cummings, 379 N.C. at 366-67, 372-73, 866 S.E.2d at 690, 694. The court in Cummings noted that the record "contain[ed] evidence tending to show that

---

[5] Defendants do not contend that their answers would have been truthful if they were aware of a history of water intrusions that had <u>not</u> been repaired.

12

significant water intrusion had occurred in the past and that [defendants] knew of the existence of this condition." Id. Like the Defendants in the present case, the sellers in Cummings pointed to repairs that had been undertaken, and argued that they had been assured that the leak had been fixed and that no further problems had been observed in the house after the performance of the relevant repair work. Id. However, the North Carolina Supreme Court found that there were genuine issues of material fact concerning the reasonableness of the seller's reliance on the repair work. Id. The Supreme Court distinguished a prior case in which problems did not reappear until sixteen years after performance of the necessary repair work, noting that "only a few months had elapsed" from the completion of the repairs and the plaintiff's discovery of water-related damage, and also noting that there were disputes of fact regarding whether the work was done by a qualified individual and whether the work was sufficient to address the issue. Id.

In the instant matter, evidence in the record reflects that Defendants had notice that water intrusion was an issue. When Chilly Dil purchased the home in 2015, a home inspection report reflected "evidence of previous moisture intrusion in the basement." (See Jt. Ex. 99 [Doc. #30-8 485–515, 496].) On October 3, 2015, before renovations began, Patricia Carlin emailed Wayne Haddock pictures of water intrusion in the basement and described it as "full flooding" and stated that she "hope[d] that nothing [would come of it]." (Jt. Ex. 68 [Doc. #30-8 at 154].) Of course, Defendants contend that these concerns were addressed and repaired by Haddock during the renovation. However, Plaintiffs point to evidence that Haddock repeatedly advised Defendants that there would still be water intrusion issues. For example, on January 13, 2016, Wayne Haddock emailed Patricia Carlin

13

and stated that installing a French drain reservoir "may not stop the ground water intrusion in the front." (Jt. Ex. 70 [Doc. #30-8 at 158].) On October 4, 2016, Wayne Haddock emailed Dave Carlin and expressly stated that water proofing areas of the basement in the manner they discussed "should help the water intrusion but you know will not stop it." (Jt. Ex. 74 [Doc. #30-8 at 171].) On November 3, 2016, Haddock again expressed his concern regarding water entering the basement and noted that "[i]f water cannot get out of the exercise room it will flood the theater room and hall." (Jt. Ex. 77 [Doc. #77 at 183].) Haddock further stated that "[w]e cannot stop the basement from flooding during a large rainfall." (Jt. Ex. 77 [Doc. #77 at 183].) In addition, even after completion of the renovations, on June 20, 2017, Haddock discovered water standing on the basement floor and a sewer lift pump was not working properly. (Jt. Ex. 81 [Doc. #30-8 at 215].) In his deposition, David Carlin admitted that Wayne Haddock told them that in his opinion, they could not stop the basement from flooding during a large rain fall. (D. Carlin Dep. [Doc. #30-2 at 38-40, 62]; see also P. Carlin Dep. [Doc. #30-1 at 50, 57–58, 121].)

Just over a year later, in September 2018, rainfall from Hurricane Florence resulted in flooding in portions of the Property's basement. (P. Carlin Dep. [Doc. #30-1 at 89].) Chilly Dil undertook approximately $40,000 in repairs on the basement, again using Wayne Haddock of Pinehurst Homes. (P. Carlin Dep. [Doc. #30-1 at 89-94].) Repairs to the basement concluded in July 2019, including additional sump pumps, new walls, epoxy on the floor, sealant on foundation walls, new drywall, baseboards, trim, and painting. (See Jt. Ex. 86 [Doc. #30-8 at 289-99].) However, according to David Carlin, Haddock told them that in his opinion, they couldn't stop some water intrusion. (D. Carlin Dep. [Doc. #30-2 at 49-

14

50].)  Most notably, Haddock specifically required Chilly Dil to execute a hold harmless agreement, providing that Chilly Dil would not "hold Pinehurst Homes, Inc. or its representatives responsible for any mold, mildew or any other problems that may occur from water intrusion at the residence." (Jt. Ex. 33, Doc. #30-8 at 316.)  Finally, George Barbour, a consulting engineer who inspected the basement after the flooding experienced by Bonita Fraim, opined that water-intrusion was an "on-going issue" and that "the cavity walls only serve[d] to obscure the problem."  (Jt. Ex. 39 [Doc. 30-7 at 246].)

As in Cummings, there are genuine issues of material fact concerning whether Defendants falsely represented or concealed the water intrusion issue in the basement. Specifically, to the extent Defendants rely on the repairs by Wayne Haddock to argue that their responses in the Disclosures were not false, the record includes evidence that Haddock repeatedly gave Defendants his opinion that they could not stop water intrusion in the basement, and further that Haddock was sufficiently concerned regarding future water intrusion and mold to require a hold harmless agreement as part of the request to repair the additional flooding after Hurricane Florence.  That hold harmless agreement and the related repairs were finished in July 2019, only a few months prior to the Disclosures and the sale in December 2019, and Bonita Fraim discovered flooding soon thereafter in February 2020. This evidence is sufficient to create a genuine issue of material fact with respect to whether Defendants reasonably relied on the repairs by Haddock in answering "No" on the Disclosure Statement and in failing to disclose the history of water intrusion in the basement.  A jury could find that Defendants were clearly on notice of the water intrusion issues, that they were repeatedly warned by Haddock that water intrusion was an ongoing

15

issue and could not be prevented, that it was clear after Hurricane Florence that those issues remained, that those concerns were further exemplified by the hold harmless agreement that Haddock required reflecting concern regarding future water intrusion and mold, and that in the circumstances Defendants could not reasonably rely on the repairs by Haddock in answering "No" on the Disclosure Statement and in failing to disclose the history of water intrusion in the basement.[6]  Therefore, Defendants' Motion for Summary Judgment on this basis should be denied, and these issues are appropriately resolved by a jury.

> 2.  Reasonable Reliance

Defendants next argue that even if material facts were misrepresented in the Disclosure Statement, Plaintiffs' reliance on the misrepresentation was not reasonable because Plaintiffs were on notice of potential water problems in the basement and did not undertake sufficient investigation and inspection.  Defendants point to MacFadden v. Louf, 182 N.C. App. 745, 643 S.E.2d 432 (2007), in support of their position.  (Def. Br. at 16.)  In McFadden, the court determined that the plaintiff "failed to establish that her reliance was justifiable because she conducted a home inspection before closing and that inspection report put her on notice of potential problems with the home." McFadden, 182 N.C. App. at 748, 643 S.E.2d at 434.  Specifically, the inspection report in McFadden:

> instructed her to have a roofing contractor inspect the roof because there was potential for water to pond above the kitchen/breeze-way area. Additionally, the report noted water staining to the chimneys from the attic area; previous water leakage at the rear porch; gutters were rusted, leaked, damaged and not functional; sagging, deflection, and general unevenness was observed at

---

[6] With respect to the fraud claim, it will be for the jury to further determine whether the construction of cavity walls, the nature of the repairs after Hurricane Florence, and in particular the failure to disclose the repairs by Pinehurst Homes conditioned by the hold harmless agreement also reflect a deliberate effort to hide the water intrusion issues and deceive the purchasers regarding those issues.

16

> various portions of the floor system; exterior wood siding and trim exhibited some general peeling paint; some of the doors were out of level; the foundation was supported by wood girders and metal house jacks below the first right foyer and below the rear kitchen floor system; there was evidence of previous moisture/pest infestation at several floor system locations when viewed from the crawl space; and water penetration was expected into the basement area and near exterior entry after periods of heavy rain.

McFadden, 182 N.C. App. at 748, 643 S.E.2d at 434. Plaintiff "elected to forego any further inquiry," and the Court of Appeals concluded that in the circumstances, reliance on the disclosure statement would have been unreasonable. McFadden, 182 N.C. App. at 749, 643 S.E.2d at 435.

The Supreme Court of North Carolina considered a similar argument in Cummings. As noted above, in Cummings the court noted that "a party cannot establish justified reliance on an alleged misrepresentation if the party fails to make reasonable inquiry regarding the alleged statement." Cummings, 379 N.C. at 366, 866 S.E.2d at 690. The Supreme Court of North Carolina has previously explained the competing policies underlying this rule as follows:

> When the parties deal at arms length and the purchaser has full opportunity to make inquiry but neglects to do so and the seller resorted to no artifice which was reasonably calculated to induce the purchaser to forego investigation, action in deceit will not lie. . . . But the rule is also well established that one to whom a positive and definite representation has been made is entitled to rely on such representation if the representation is of a character to induce action by a person of ordinary prudence, and is reasonably relied upon. . . . The right to rely on representations is inseparably connected with the correlative problem of the duty of a representee to use diligence in respect of representations made to him. The policy of the courts is, on the one hand, to suppress fraud and, on the other, not to encourage negligence and inattention to one's own interest.

Calloway v. Wyatt, 246 N.C. 129, 134-35, 97 S.E.2d 881, 885-86 (1957). Similarly, the North Carolina Supreme Court has further explained that:

17

'The question is whether it is better to encourage negligence in the foolish or fraud in the deceitful.' Annot., Fraud predicated upon vendor's misrepresentation of physical condition of real property, 174 A.L.R. 1010, 1025. In White Sewing Machine Co. v. Bullock, 161 N.C. 1, 9, 76 S.E. 634, 637; and Cofield v. Griffin, supra, 238 N.C. at 381, 78 S.E.2d at 134 (both cases in which the court rejected such contentions by the defendant), it is said: "We are not inclined to encourage falsehood and dishonesty by protecting one who is guilty of such fraud on the ground that his victim had faith in his word, and for that reason did not pursue inquires which would have disclosed the falsehood." See Annot., Opportunity of buyer of personal property to ascertain facts as affecting claim of fraud on part of seller in misrepresenting property, 61 A.L.R. 492, 505–506 (doctrine of reasonable reliance in early North Carolina cases).

In Cowart v. Honeycutt, 257 N.C. 136, 142, 125 S.E.2d 382, 387, a case in which the plaintiff contended that she was prevented from reading a release by the fraud of the defendant, Parker, J., speaking for this Court, said:

'Defendant in his brief admits that there was evidence of a false representation of a material fact which was relied upon by plaintiff, but contends plaintiff as a matter of law was not justified in relying upon such representation, and her reliance was not reasonable. Such a contention is without merit. Our reply to such contention is this: 'In Gray v. Jenkins, 151 N.C. 80, 65 S.E. 644, 645, this Court said: 'The law does not require a prudent man to deal with everyone as a rascal, and demand covenants to guard against the falsehood of every representation which may be made as to facts which constitute material inducements to a contract. There must be a reliance on the integrity of man or else trade and commerce could not prosper.' Roberson v. Williams, 240 N.C. 696, 83 S.E.2d 811.

Just where reliance ceases to be reasonable and becomes such negligence and inattention that it will, as a matter of law, bar recovery for fraud is frequently very difficult to determine. This case presents that difficulty. In close cases, however, we think that a seller who has intentionally made a false representation about something material, in order to induce a sale of his property, should not be permitted to say in effect, 'You ought not to have trusted me. If you had not been so gullible, ignorant, or negligent, I could not have deceived you.' Courts should be very loath to deny an actually defrauded plaintiff relief on this ground. When the circumstances are such that a plaintiff seeking relief from alleged fraud must have known the truth, the doctrine of reasonable reliance will prevent him from recovering for a misrepresentation which, if in point of fact made, did not deceive him. In such a case the doctrine is the specific remedy for a complainant who is, so to speak, malingering. A plaintiff who, aware, has made a bad bargain should not be

allowed to disown it; no more should a fraudulent defendant be permitted to wriggle out on the theory that his deceit inspired confidence in a credulous plaintiff.

Johnson v. Owens, 263 N.C. 754, 757-58, 140 S.E.2d 311, 313-14 (1965).

The Supreme Court of North Carolina applied these principles in Cummings, and found that the question of reasonable reliance was for the jury. See Cummings, 379 N.C. at 370-71, 866 S.E.2d at 692–93. In Cummings, the plaintiffs obtained a home inspection that noted numerous problems that needed repair, including the presence of minor roof damage, a need to seal exterior walls to keep water from entering the home, a lack of seal on some doors, rust stains on some doors and windows, the existence of minor leaks that could lead to mold, and loose drywall type reflecting a lack of air movement. However, nothing in the report "suggested that the house had experienced significant water intrusion." Cummings, 379 N.C. at 354, 866 S.E.2d at 682. The sellers in Cummings argued that the inspection put plaintiffs on notice that additional investigation was required, and the sellers also pointed to "(1) the presence of language in the disclosure statement disclaiming any warranties and recommending that plaintiffs retain a licensed home inspector; (2) the existence of language in the purchase contract indicating that the house was being sold in its 'current condition' and disclaiming all warranties; (3) the fact that [the inspector] noted the need to seal areas on the exterior of the house and to rectify problems with windows and doors that would either not open and close or would not seal properly; and (4) the statement in [the inspection] report that he had 'attempt[ed] to find a leak but sometimes cannot' and his 'recommend[ation] that qualified contractors be used' to inspect and repair the problems

19

identified in the report." <u>Cummings</u>, 379 N.C. at 368, 866 S.E.2d at 691. The Supreme

Court of North Carolina concluded that there were genuine issues of material fact:

> In light of the fact-intensive nature of the relevant inquiry, "[t]he reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion." <u>Forbis v. Neal</u>, 361 N.C. 519, 527, 649 S.E.2d 382 (2007). Unlike the plaintiffs in <u>Stevens</u>, who failed to conduct any inspection of the relevant property prior to the closing, 268 N.C. App. at 656, 836 S.E.2d 675, plaintiffs hired a licensed home inspector and general contractor for the purpose of performing a home inspection. As a result, the operative question for the purpose of this case is whether obtaining the performance of the inspection conducted by [the inspector] constituted "reasonable diligence" on the part of plaintiffs or whether plaintiffs should have obtained additional inspections, including the performance of more intrusive moisture testing.
>
> . . . .
>
> [The sellers] rely upon <u>MacFadden v. Louf</u>, in which the Court of Appeals held that a home buyer could not reasonably rely upon alleged misrepresentations contained in a disclosure statement "because [the buyer] conducted a home inspection before closing and that inspection report put her on notice of potential problems with the home." 182 N.C. App. 745, 748, 643 S.E.2d 432 (2007). <u>MacFadden</u> is distinguishable from this case, however, given that the inspection report at issue there specifically instructed the plaintiff to hire a roofing contractor in light of the existence of extensive evidence tending to suggest that a potential for water to pond existed, with this evidence including the presence of stains on the chimney and in the attic area; the fact that the floor sagged, deflected, and was uneven; and the fact that other evidence of moisture and pest infestation was present. <u>Id.</u> As we have already noted, the report that [the inspector] prepared concerning the house that is at issue in this case made only generalized comments about the need for further inspections and did not suggest that any significant amount of water intrusion had occurred.
>
> Admittedly, plaintiffs could have engaged in additional investigative activities, including requesting Oak Island Accommodations' maintenance records or having more intrusive moisture testing performed. On the basis of the present record, however, the extent to which plaintiffs' failure to take such additional steps constituted a failure to exercise "reasonable diligence" is a question of fact for the jury rather than a question of law for the Court.

<u>Cummings</u>, 379 N.C. at 369-70, 866 S.E.2d at 691-92.

In the instant matter, Plaintiffs received a home inspection that had been conducted two weeks earlier for a previous potential buyer, the McKeithen Report. Importantly, Plaintiffs then obtained eight additional inspections to look at issues that were raised by the McKeithen Report. Defendants refer to the investigation Plaintiffs underwent as "thorough." (Defs. Br. at 18.) Notably, the McKeithen Report listed no major concerns or items to monitor. (Jt. Ex. 7 [Doc. #30-7 at 28].) In the section of the McKeithen Report dedicated to the basement, the report indications that the condition of the basement is satisfactory; that the basement walls are finished; and that there was no indication of moisture. (Jt. Ex. 7 [Doc. #30-7 at 75].) The McKeithen Report did note that there appeared to be moisture or termite damage beneath the basement step and that it should be evaluated and if necessary, repaired by a qualified building contractor. (Jt. Ex. 7 [Doc. #30-7 at 80].) In addition to the McKeithen Report, Plaintiffs obtained a report from Neal Smith, a structural engineer, who noted a small trench with standing water in it that ran to a box but ultimately concluded that "NSE found nothing of great concern structurally" and that there were "some minor issues that can be repaired with normal methods." (Jt. Ex. 9 [Doc. #30-7 at 104–05].) Specifically with respect to the reference to "standing water", Plaintiffs' real estate agent noted that there was a narrow trench in the floor that was identified in the inspections as a condensation line running from a dehumidifier. (Snyder Dep. [Doc. #30-6 at 88].) During her deposition, Plaintiffs' real estate agent noted that she did not know what other inspections they could have gotten, and that the inspections, including by a licensed inspector, an engineer, an HVAC contractor, and a plumber, did not give notice of any

21

serious water intrusion problems and confirmed Plaintiffs' reliance on the Disclosures. (Snyder Dep. [Doc. #30-6 at 88].)

As noted above, under North Carolina law the reasonableness of a party's reliance is ordinarily a question for the jury, and a court may grant summary judgment only when the facts are so clear that they only support one conclusion. Such facts are not present in the instant matter. As in Cummings, Defendants point to language in the Contract exhorting the Buyer to exercise due diligence including inspections of the property, as well as language in the Contract that the Property was being sold in its current condition. Defendants also point to "presence of seven sump pumps, four dehumidifiers, dry lock applied to the walls of the basement, standing water, and dry rot" in the basement as evidence that Plaintiffs had actual and constructive notice of the potential for moisture issues. (Defs. Br. at 18.) However, nine inspections did not reveal or indicate a water intrusion issue, and the instant matter is not one in which Plaintiffs failed to investigate. Unlike the plaintiff in MacFadden who failed to conduct any further inspection of the home prior to closing even though the inspection gave specific notice and a specific recommendation for further roof inspection, the Plaintiffs in the instant matter obtained eight additional inspections to further look at potential issues that were highlighted by the McKeithen Report. In the circumstances, and in balancing the considerations identified by the North Carolina Supreme Court, the Court cannot find as a matter of law Plaintiffs were malingering or failing to exercise due diligence. As in Cummings, this is not a case where the facts are so clear as to permit only one conclusion, and it is for the jury to consider and determine whether Plaintiffs' failure to undertake additional investigation and inspection constituted a failure to exercise reasonable

diligence. Therefore, viewing the evidence in the light most favorable to Plaintiffs as required in evaluating a motion for summary judgment, there are genuine issues of material fact regarding whether Plaintiffs reasonably relied on the Disclosures, and Defendants' Motion for Summary Judgment should be denied.

### B. Plaintiffs' Unfair and Deceptive Practices Claim

Under North Carolina General Statute 75-1.1, "[u]nfair methods of competition in or affecting commerce" are unlawful. To state a claim for unfair and deceptive practices under North Carolina General Statute § 75-1.1, a plaintiff must allege: (1) that the defendant committed an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) that the plaintiff was injured thereby. In the present case, Defendants contend that they are entitled to summary judgment as the Property was a residential dwelling and, according to Defendants, "North Carolina law prohibits Chapter 75 claims relating to the sale or purchase of residential property." (Defs. Br. at 19–20.)

In the context of real estate transactions, the North Carolina Court of Appeals has recognized a limited "homeowner's exemption" whereby private homeowners selling their private residence are not subject to unfair and deceptive practice liability. See MacFadden v. Louf, 643 S.E.2d 432, 433 (2007). The Supreme Court of North Carolina has not specifically adopted such a homeowner's exception, but has held that "[a]ssuming that a 'homeowner's exception' exits, its application is limited to an individual involved in the sale of his or her own residence." Bhatti v. Buckland, 328 N.C. 240, 246, 400 S.E.2d 440 (1991). In Bhatti, the North Carolina Supreme Court assumed, *arguendo*, that such a homeowner's exception exists and that "the sale by a private party of his or her residence is not within the

23

scope of Chapter 75," but nevertheless found that the exception would not apply in that case because "[d]efendant's advertising of this property explicitly appealed to 'Investors and Speculators' as well as 'Homeseekers'", and evidence indicated that the defendant had a residence separate from the property at issue. Bhatti v. Buckland, 328 N.C. at 244-46, 400 S.E.2d 440, 443-44 (1991). The Bhatti decision noted that the defendant would have the burden of proving that he was a "private party engaged in the sale of a residence," and in that case the court found that the evidence was "insufficient to carry defendant's burden" and "that the sale fell within the ambit of the inclusive phrase 'business activities, however denominated,' N.C.G.S. § 75–1.1(b), and was therefore 'in or affecting commerce' within the meaning and intent of that phrase as used in N.C.G.S. § 75–1.1(a)." Id.

In this case, Defendants argue that they are exempt from Chapter 75 because "the property is a residential dwelling." (Defs. Br. at 19.) However, as outlined above by the North Carolina Supreme Court, even if a homeowner's exception exists, it does not apply simply because the property is a "residential dwelling" or the "claims relat[e] to the sale or purchase of residential property" as Defendants contend; rather, such an exception is limited to the sale by a private party of his or her own residence. Bhatti, 328 N.C. at 244-46, 400 S.E.2d 440, 443-44. Plaintiffs contend that Defendants have not shown that the homeowner's exemption is applicable in this case given that the Property was owned and sold by Chilly Dil, Inc., a for profit Florida corporation, not by a private individual. In addition, Plaintiffs note that the Property was marketed for commercial purposes. The real estate listing for the Property specifically indicated that "[the Property] offers a unique opportunity as an income producing property for corporate retreats, family retreats, and

24

would make a profitable rental for the 2024 US Open golf tournament. The current owners have had much success renting the estate to corporate groups & tourists at approximately $1400 per night." (Jt. Ex. 90 [Doc. #30-8 at 331].) In their depositions, the Carlins acknowledge that they rented the home out on several occasions for unspecified lengths of time. Finally, while Defendants contend that the Carlins did live in the home for a period of time, the evidence reflects that the Property was listed for sale only a few months after the renovations were completed and a Certificate of Occupancy was issued, and it is undisputed that the Carlins moved to Utah in November 2018, more than a year before the purchase by Plaintiffs in December 2019. An article from Pine Straw Magazine noted that the Carlins commute to North Carolina from their primary residence in Park City, Utah, and "don't do much day-to-day living at [The Property]." (Jt. Ex. 51 [Doc. #30-8 at 5, 12].)[7]

Given the evidence in the record, the Court cannot find that Defendants have proved as a matter of law that Defendants fall within the exception for "an individual involved in the sale of his or her own residence." Therefore, Defendants' Motion for Summary Judgment as to Plaintiffs' claim for unfair and deceptive trade practices should be denied.

III.   PARTIES

The Court next considers Defendants' contentions that the Plaintiffs lack standing or are not proper parties in interest. With respect to Bonita Fraim, Defendants argue that "[t]he evidence is uncontroverted that [Bonita] Fraim did not purchase the Property and has

---

[7] In addition, emails from Defendants' real estate agent to the Carlins reflect that in their representations to potential buyers, they noted that the Property "in its current state has 48 days requested for rent in 2020 - @ $1500 per night that is 72k in income. No other house in Old Town can garner that kind of income." (Pl. Notice [Doc. #37-1 at 1].) These emails also include discussions regarding the Disclosures, particularly the option to leave it blank and note "No Representation" with a note by the real estate agent that "a lot of times in situations like this with it being more of an investment property vs. a primary residence, this is the way sellers choose to fill it out." (Pl. Notice [Doc. #37-1at 6].)

no legal interest in the Property" and that "any favorable decision by this Court will only benefit the Trust, not [Bonita] Fraim." (Defs. Br. at 20.) According to Defendants, any claim that Bonita Fraim suffered an injury in fact was terminated when she "decided not to purchase the Property." (Defs. Br. at 20.) Plaintiffs counter that the evidence in the record shows that Bonita Fraim has been injured because she lost use of the Property and is a beneficiary of the Fraim Trust, which ultimately purchased the property.

Under the general common law rule, "injury to the property placed in a trust may only be redressed by the trustee." Slaughter v. Swicegood, 162 N.C. App. 457, 465, 591 S.E.2d 577, 582–83 (2004). However, several exceptions to this common law rule have been recognized by North Carolina courts. Among those exceptions, North Carolina courts have recognized that "[w]hen the beneficiary is in actual physical possession of trust property, he can sue for injury to the possession or to enjoin a disturbance of possession of the property." Slaughter v. Swicegood, 162 N.C. App. at 465, 591 S.E.2d at 582–83 (citing George G. Bogert & George T. Bogert, The Law of Trusts and Trustees § 869 at 117 (rev.2d ed.1995) and Restatement (Second) of Trusts § 281); see also Restatement (Second) of Trusts § 280 ("In a suit in equity brought by the trustee against a third person, the beneficiary is ordinarily not a necessary party although he is a proper party.").

In their response to the Motion for Summary Judgment, Plaintiffs point to this guidance and point to evidence in the record indicating that Bonita Fraim was a beneficiary of the Trust and was in actual physical possession of the trust property that serves as the basis for the claims before the Court and would have an interest based on injury to her possession of that property. (W. Fraim Dep. [Doc. #30-4] at 14; B. Fraim Dep. [Doc. #30-

26

3] at 74–75.) In Reply, Defendants do not address this issue at all. In addition, in the briefing, Defendants do not cite any cases or authority to establish that in these circumstances, Bonita Fraim may not be joined as a party under the exceptions and guidance recognized above. Given the lack of full briefing on this issue, it appears that this issue should be addressed further at trial, and Defendants have failed to establish a basis for dismissal of Bonita Fraim at this time.

Defendants also contend that William Fraim was not a purchaser under the contract and therefore is not a proper party and does not have standing to sue. (Defs. Br. at 20.) In response, Plaintiffs note that as the Trustee of the Trust, William Fraim is clearly a real party in interest. Federal Rule of Civil Procedure 17(a) provides that "a trustee of an express trust" may sue in his own name, and the U.S. Supreme Court has held "that trustees of an express trust are entitled to bring diversity actions in their own names and upon the basis of their own citizenship." Navarro Sav. Ass'n v. Lee, 446 U.S. 458, 462 (1980). Thus, a trustee with real and substantial control over the assets or claims is the "real party to the controversy" and such trustees may "sue in their own right." 466 U.S. at 465-66. Thus, William Fraim is clearly a proper party.

Finally, with respect to the Trust itself, Defendants contend that the Trust cannot bring a claim related to the real estate contract because the Trust was "never identified as a 'buyer' or 'purchaser' in any real estate contract relating to the sale of the Property" and was therefore "not entitled to receive or rely upon the Disclosure Statement." (Defs. Br. at 20.) According to Defendants, the Trust, "elected to buy the Property and close within 36 hours without the benefit of a contract or the disclosure statement" and "was not entitled to

27

receive or rely upon the Disclosure Statement." (Defs. Br. at 21.) Plaintiffs, on the other hand, contend that the rights under the Purchase Agreement were assigned to the Trust and that the contract was amended with the agreement of all Parties to substitute the Trust for Bonita Fraim.

Generally, under North Carolina law, contracts are freely assignable unless prohibited by statute, public policy, or the terms of the contract. Parkersmith Properties v. Johnson, 136 N.C. App. 626, 632, 525 S.E.2d 491, 494 (2000). In this case, Provision 12 of the Offer to Purchase Contract regarding assignment of rights expressly provides: "ASSIGNMENTS: This Contract may not be assigned without the written consent of all parties except in connection with a tax-deferred exchange, but if assigned by agreement, then this Contract shall be binding on the assignee and assignee's heirs and successors." (Jt. Ex. 1 [Doc. #30-7 at 10].) Review of the record reflects that Plaintiffs have produced a written Assignment and Amendment Agreement signed by Bonita and William Fraim. (Jt. Ex. 95 [Doc. #30-8 at 418].) Plaintiffs contend that Patricia Carlin, in her capacity as President of Chilly Dil, consented to the assignment to the William Fraim Trust in writing by executing the deed to the Fraim Trust, authorizing the execution of the HUD-1 Settlement Statement; and accepting the settlement proceeds from the Fraim Trust. (Pls.' Br. at 24.) In addition, evidence in the record reflects that on December 9, 2019, Plaintiffs' closing attorney, James McNeil, emailed Chilly Dil's attorney Raymond Gatti notifying him of the contract amendment "amending the grantee to: William L. Fraim, Trustee of the William L. Fraim Trust, originally dated September 2, 1986, as amended" to which Ray Gatti responded "revised" in writing, approving the change and making the revision. (Jt. Ex. 94 [Doc. #30-8

28

at 411-12].) Additionally, in text message exchanges, Chilly Dil's real estate agent Audrey Wiggins informed the Carlins that they "[m]ay need to sign a name change to the contract but other than that we are good. It's going into a trust instead of her name only," and Patricia Carlin responded, in writing, "Sounds good." (See Jt. Ex. 93 [Doc. #30-8 at 397].) Finally, Patricia Carlin during her deposition was asked if she signed the Assignment and Amendment on behalf of Chilly Dil and she said, "Probably. Sure, I had to." (P. Carlin Dep. [Doc. #30-1 at 109].) Thus, evidence reflects that Chilly Dil was aware of Assignment and Amendment, and agreed to it in writing through its representative, its attorney, and its real estate agent, and ultimately accepted the tender and settlement of funds from the Trust having knowledge of the assignment of rights to the Trust. [8]

Moreover, the claims in this case are not breach of contract claims of the Offer to Purchase Contract; instead the claims are based on negligent misrepresentation and fraud in concealing the water intrusion issues and making false statements on the Disclosures. Under the applicable North Carolina statutes, N.C. Gen. Stat. 47E-4(a), Defendant Chilly Dil was obligated to provide the buyer or purchaser with a copy of the Disclosures. To the extent the Trust became the purchaser, there is evidence in the record that the Disclosures had already been provided to William Fraim who was the Trustee. William Fraim testified in his

---

[8] In addition, while not addressed by the parties, there may be issues of quasi-estoppel to consider. "Quasi-estoppel is based on a party's acceptance of the benefits of a transaction, and provides [that] "where one having the right to accept or reject a transaction or instrument takes and retains benefits thereunder, he ratifies it, and cannot avoid its obligation or effect by taking a position inconsistent with it." Parkersmith Properties v. Johnson, 136 N.C. App. 626, 632, 525 S.E.2d 491, 495 (2000) (internal citation omitted). The record reflects that not only did Chilly Dil have knowledge of and approve of the Assignment and Amendment, but it chose to make the requested revisions and move forward with and benefit from the transaction, which is inconsistent with Defendants efforts to now deny the validity of the assignment from which Chilly Dil benefitted.

deposition that he received and reviewed the Disclosures prior to the closing, and was also involved in reviewing and obtaining the inspections. (W. Fraim Dep. [Doc. #30-4 at 28-32].) Under these facts, it is simply not the case that, as a matter of law, the Trust elected to purchase the Property and close within 36 hours without the benefit of any contract or disclosure statement as Defendants contend. Taking the evidence in the light most favorable to Plaintiffs, the evidence reflects that the Disclosures were provided to William Fraim who was the Trustee of the Trust that ultimately purchased the Property from Chilly Dil, that William Fraim received and relied on the Disclosures and participated in the inspection process prior to closing, that the Defendants then proceeded with the transaction and sold the Property to the Trust, and that William Fraim may now assert claims for fraud and misrepresentations in the Disclosures. In the circumstances, Defendants have failed to establish that there are no genuine issues of material fact to support dismissal of the claims asserted on behalf of the Trust in this case.

IV.     CONCLUSION

IT IS THEREFORE RECOMMENDED that Defendants' Motion for Summary Judgment [Doc. #28] be DENIED.

This, the 25th day of July, 2022.

                              /s/ Joi Elizabeth Peake
                              United States Magistrate Judge

30